# In The United States Court of Federal Claims

No. 07-73C

(Filed Under Seal: June 7, 2007)

(Reissued: June 28, 2007)[1]

---

| | | |
|---|---|---|
| ARINC ENGINEERING SERVICES, LLC, | * | Post-award bid protest; Contract for space |
| | * | and missile defense integration; Motion for |
| | * | judgment on the administrative record – |
| Plaintiff, | * | nature of review – *Bannum*; Claimed |
| v. | * | organizational conflict of interest – relevant |
| | * | FAR provisions described; Unequal access |
| THE UNITED STATES, | * | to information; Multi-factored test; Nature of |
| | * | limited prejudice inquiry in case involving |
| Defendant, | * | organizational conflict of interest; |
| | * | Distinguishing between desirable benefits of |
| and | * | incumbency and unequal access to |
| | * | information giving rise to organizational |
| BAE SYSTEMS ANALYTICAL | * | conflict of interest; Contracting officer |
| SOLUTIONS, INC., | * | determination that no organizational conflict |
| | * | of interest existed upheld as not arbitrary and |
| Defendant-Intervenor. | * | capricious; Relief denied. |
| | * | |

---

**OPINION**

---

*William Thomas Welch*, Barton, Baker, McMahon & Tolle, McLean, VA, for plaintiff.

*Michael James Dierberg*, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Peter D. Keisler*, for defendant.

*Drew Alan Harker*, Arnold & Porter, Washington, D.C., for defendant-intervenor.

---

[1] An unredacted version of this opinion was issued under seal on June 7, 2007. The opinion reissued today incorporates the parties proposed redactions and corrects minor errors. The redacted material is represented by brackets [ ].

**ALLEGRA, Judge**:

This post-award bid protest action is before the court on the parties' cross-motions for judgment on the administrative record. Plaintiff, ARINC Engineering Services, LLC (ARINC), contends that in awarding a contract for space and missile defense integration, the United States Department of the Army (the Army) violated regulations governing organizational conflicts of interest by allowing the awardee to have unequal access to information. Defendant responds that the informational advantages of which plaintiff complains are those typically associated with incumbency and created no organizational conflict of interest here. After careful consideration of the briefs and other materials filed by the parties, the oral argument, and for the reasons discussed below, the court **DENIES** plaintiff's motion for judgment on the administrative record and instead **GRANTS** defendant's cross-motion.

## I. BACKGROUND

The Army Space and Missile Defense Command Battle Lab (SMDC-BL) developed the Concepts and Operations for Space and Missile Defense Integration Capabilities (COSMIC) Program to support its new mission of space, near space and missile defense capabilities integration and development. SMDC-BL intends to use COSMIC to support the U.S. Space and Missile Defense Future Warfare Center. In March of 2006, the Army issued a draft Request for Proposals (RFP) under Solicitation No. W91260-06-R-0005 for the COSMIC contract. On April 4, 2006, the SMDC-BL held an industry conference, at which it told potential offerors it did not intend to establish a bidders library, but rather would "provide all of the information necessary to respond to the Task Order[s]" required by the RFP. A participant at that conference inquired about whether "incumbent Task Orders" had anything to do with the Sample Tasks that were the subject of the RFP, to which the Army responded – "[n]o, the Sample Task Orders are new requirements." After the conference, the Army issued several more drafts of the RFP.

On July 5, 2006, defendant, acting by and through the Army Space and Missile Defense Command (SMDC), issued the final version of the RFP for services related to the COSMIC program. The RFP contemplated the award of a cost-plus-fixed-fee, indefinite delivery/indefinite quantity award term contract to perform systems integration services for the SMDC. The RFP called for proposals to be submitted by July 27, 2006; that time eventually was extended, by amendment, to August 10, 2006. The RFP required the award to be made to the offeror proposing the best value to the government in accordance with the stated evaluation criteria. The RFP contemplated multiple awards, with at least one award set aside for small businesses.

The RFP's Statement of Work (SOW) provided that the "integrator" services to be supplied under the contract include, but are not limited to, tasks and capabilities such as: recognition of sources who may provide space, near space, and missile defense capabilities; knowledge of science and technology community initiatives and technology exploration and identification; technical/system integration and development of operational prototypes; wargaming; configuration management and software development; and help-desk capability. The RFP anticipated that three task orders would be issued under the contract: Knowledge

Management (KM); High Altitude Long Endurance (HALE); and Space and Missile Defense Operations Technology (SMOTE). The most important of these, at least for evaluation purposes, was the SMOTE task order. It requires the contractor to support space and missile defense innovations by, *inter alia*, integrating two existing programs – the Future Operational Capability Tactical Operations Center (FOC-TOC) and the Space Support Element Toolset (SSET) – providing troops using specially equipped High-Mobility Multipurpose Wheeled Vehicles (Humvees) with a combined space and missile defense system that is easily reconfigurable and multi-mission capable.[2] Each offeror was asked to submit a Task Order Plan (TOP) for each of the three proposed tasks, describing its approach and understanding of the task.

The RFP identified four evaluation factors: Task Order Plan, Management, Small Business Participation Plan, and Cost. The TOP and Management factors were relatively equal in weight. When combined, the TOP and Management factors were significantly more important than the Small Business Participation Plan and Cost factors. The Small Business Participation Plan factor was slightly more important than the Cost factor. Within the TOP factor, the SMOTE task order was the most important, followed in importance by the HALE and KM task orders. When combined, the HALE and KM task orders were less important than the SMOTE task order. The RFP provided that, to be eligible for award, a rating of no less than "Satisfactory," had to be achieved for the Task Order Plan Area, the Management Area and the Small Business Participation Plan. The Cost factor was not rated, but the RFP stated that poor cost realism could result in a lower evaluation of an offeror's proposal and be viewed as a lack of understanding of the contract requirements. The RFP provided that "[o]fferors submitting cost proposals that are so unrealistically high or low as to preclude a reasonable chance of being selected for award may be excluded from the competitive range."

Both ARINC and BAE Analytical Solutions, Inc. (BAE) had experience relevant to the SMOTE task order. These companies performed work on the SSET through the Space Technology, Application and Requirements Support (STARS) contract. Under that contract, ARINC provided SSET design, integration, testing, training, and accreditation, as well as exercise support. ARINC also had experience relevant to the FOC-TOC through its work on the Joint Based Expeditionary Connectivity Center (JBECC), which is essentially an improved version of the FOC-TOC. Almost all the software applications, hardware and communications equipment in the FOC-TOC and JBECC are identical. BAE also performed work on the FOC-

---

[2] The FOC-TOC is a prototype platform designed to support air and missile defense development. It consists of Humvees with a communications shelter that contains a broad array of communications and battle management systems. It is designed for rapid reconfiguration and expandability, and normally comes with a generator trailer, an 86-foot antenna mast, and a tent shelter that can house a 10-12 person combat operations center. The SSET provides global broadband communications that support forward deployed soldiers who provide space services such as analysis and estimates and products such as commercial imagery to commanders. It is configured in a rigid walled shelter mounted to a Humvee.

TOC through a task order in the Systems Engineering and Technical Assistance Contract (SETAC).

Five offerors submitted proposals in response to the RFP, including ARINC, BAE and Quantum Research International, Inc. (Quantum). The Source Selection Evaluation Board (SSEB) conducted evaluations from July 31, 2006, to August 16, 2006, and concluded that BAE and Quantum offered the most advantageous approaches and the best value to meet the Army's objectives. The Price/Cost Team evaluated the cost proposals, rating the offerors as follows:

| Offeror | Cost |
|---|---|
| ARINC | $ [ ] |
| Schafer | $ [ ] |
| Quantum | $ [ ] |
| BAE | $ [ ] |
| Dynetics | $ [ ] |

The parties agree that the following chart accurately summarizes the Army's evaluation of the TOPs submitted by the offerors:

| | Schafer | | Quantum | | Dynetics | | BAE | | ARINC | |
|---|---|---|---|---|---|---|---|---|---|---|
| Evaluation Area | Adj Rating | Risk Rating | Adj Rating | Risk Rating | Adj Rating | Risk Rating | Adj Rating | Risk Rating | Adj Rating | Risk Rating |
| TO # 1 SMOTE | [ ] | [ ] | Sat | Moderate | [ ] | [ ] | Good | Low | Marginal | High |
| TO #2 HALE | [ ] | [ ] | Good | Moderate | [ ] | [ ] | Excellent | Moderate | Excellent | Low |
| TO #3 KM | [ ] | [ ] | Sat | Low | [ ] | [ ] | Good | Low | Sat | Moderate |
| TOP AREA | [ ] | [ ] | Sat | Moderate | [ ] | [ ] | Good | Low | Sat | Moderate |

As this chart reveals, in its technical evaluation of the TOPs, the Army found ARINC to be "Satisfactory," but with a "Moderate Risk." The Army attributed the latter risk to ARINC's proposed response to the SMOTE task order, which, in the Army's view, failed to demonstrate an in-depth understanding of the SMOTE requirements. By comparison, the Army found BAE's TOPs to demonstrate a "Good" understanding, with a "Low Risk."

Evaluating the Management Area, the Army assigned BAE a "Good" rating, finding that it had a complete understanding of the five major task areas and had demonstrated "a strategic approach to managing these areas in a long term effort." By comparison, the SSEB assigned ARINC's Management Plan a "Marginal" rating with an accompanying "High Risk" determination, asserting, *inter alia*, that ARINC had: (i) failed to address long-range strategic

foci in support of the five major task areas for the COSMIC SOW; (ii) proposed key personnel with a lack of demonstrated experience or expertise in critical task areas; and (iii) proposed the use of staffing agencies, raising concerns regarding its consistent access to known skills and talent. The SSEB rated ARINC's Management proposal as "High Risk" because its "failure to address a strategic direction for each of the five SOW focus areas indicates that they do not have a thorough understanding of the contract requirements coupled with a lack of depth and a lack of subcontractors experience."

On September 20, 2006, the SMDC notified offerors of the award of two contracts – one to BAE under full and open competition and one to Quantum, as a small business. ARINC requested and received a debriefing on September 25, 2006. On September 29, 2006, ARINC filed a protest with the GAO alleging that the Army conducted an improper technical and cost evaluation. Later in that proceeding, ARINC alleged that the BAE team had an organizational conflict of interest (OCI) because of its advantage in connection with the FOC-TOC requirement. On October 30, 2006, the Army notified the GAO and ARINC that the contracting officer had decided to take corrective action by documenting the Army's OCI analysis. On November 1, 2006, GAO dismissed the protest based upon the proposed corrective action. On November 9, 2006, the contracting officer issued a determination and finding in which she determined that BAE did not have unequal access to information relevant to the task orders and that the previous work performed by BAE did not give it an unfair competitive advantage because its previous work was not the same as that under the SMOTE task order. She also found that both ARINC and BAE had experience relevant to the FOC-TOC through their prior contracts, as well as knowledge developed during their performance under the STARS contract.

On November 9, 2006, the Source Selection Authority issued an addendum to the source selection decision, reaffirming the selection of BAE for the contract award. On November 17, 2006, ARINC was notified of this decision. On November 27, 2006, it filed a new protest with the GAO, again alleging, *inter alia*, the existence of an organizational conflict of interest. On December 28, 2006, ARINC withdrew this protest. On January 30, 2007, plaintiff filed suit in this court. On January 31, 2007, this court granted BAE's motion to intervene in this action. Subsequently, the parties filed cross-motions for judgment on the administrative record.

## II. DISCUSSION

We begin with common ground. The Federal Circuit, in *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005), instructed that courts must "distinguish . . . [a] judgment on the administrative record from a summary judgment requiring the absence of a genuine issue of material fact." Toward this end, *Bannum* teaches that two principles commonly associated with summary judgment motions – that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences must be weighed in favor of the non-moving party – are inapplicable to a motion for a judgment on the administrative record. *Id*. at 1356-57. It thus made clear that the existence of a fact question neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full blown

evidentiary proceeding. *Id*.; *see also Int'l Outsourcing Servs., L.L.C. v. United States*, 69 Fed. Cl. 40, 45-46 (2005).[3] Rather, such questions must be resolved by reference to the administrative record, as properly supplemented – in the words of the Federal Circuit, "as if [the Court of Federal Claims] were conducting a trial on [that] record." *Bannum*, 404 F.3d at 1357; *see also Int'l Outsourcing*, 69 Fed. Cl. at 46; *Carlisle v. United States*, 66 Fed. Cl. 627, 630-31 (2005); *Doe v. United States*, 66 Fed. Cl. 165, 174 (2005), *aff'd*, 2007 WL 1073870 (Fed. Cir. 2007).[4]

*Bannum*'s approach to motions for judgment on the administrative record makes particular sense given the limited nature of the review conducted in bid protests. In such cases, this court will enjoin defendant only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2006); *see also* 28 U.S.C. § 1491(b)(4) (2006). By its very definition, this standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural*

---

[3] *Bannum* was based upon RCFC 56.1, which was recently abrogated and replaced by RCFC 52.1. However, the latter rule was designed to incorporate the decision in *Bannum*. *See* RCFC 52.1, Rules Committee Note (June 20, 2006); *see also NVT Technologies, Inc. v. United States*, 73 Fed. Cl. 459, 462 n.3 (2006); *Bice v. United States*, 72 Fed. Cl. 432, 441 (2006).

[4] In *Bannum*, the Federal Circuit noted that, in *Banknote Corp. of Am. Inc. v. United States*, 365 F.3d 1345, 1352-53 (Fed. Cir. 2004), it had erroneously conflated the standards under RCFC 56 and 56.1, albeit in *dicta*. In this regard, the *Bannum* court stated that –

> Although it never reached the factual question of prejudice, the *Banknote II* court added that it is the trial and appellate courts' task to "determine whether there are any genuine issues of material fact as to whether the agency decision lacked a rational basis or involved a prejudicial violation of applicable statutes or regulations." This language equates a RCFC 56.1 judgment to a summary judgment under RCFC 56 and is unnecessary to the *Banknote II* holding. Because the court decided the issue by an interpretation of the solicitation, *e.g.*, making a legal determination, the court in *Banknote II* did not need to consider whether the trial court overlooked a genuine dispute or improperly considered the facts of that case.

*Bannum*, 404 F.3d at 1354. Prior decisions of this court have made the same error. *See*, *e.g.*, *JWK, Int'l Corp. v. United States*, 49 Fed. Cl. 371, 387 (2001), *aff'd*, 279 F.3d 985 (Fed. Cir. 2002). Indeed, while various decisions of this court refer to a "motion for summary judgment on the administrative record," *see*, *e.g.*, *ManTech Telecom. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 64-65 (2001), *aff'd*, 30 Fed. Appx. 995 (Fed. Cir. 2002), there was no such thing under former RCFC 56.1 (and is no such thing under RCFC 52.1), as properly construed.

*Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 538 (2003); *Gulf Group, Inc. v. United States*, 56 Fed. Cl. 391, 396 n.7 (2003). As the focus of this standard is more on the reasonableness of the agency's result, rather than its correctness, the court, in order to apply this standard properly, must exercise restraint in examining information that was not available to the agency. A failure to do so risks converting arbitrary and capricious review into a subtle form of *de novo* review.[5] At all events, this court will interfere with the government procurement process "only in extremely limited circumstances." *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983).

It is the burden of the aggrieved bidder to demonstrate that the challenged agency decision is either irrational or involved a clear violation of applicable statutes and regulations. *Banknote Corp. of America*, 365 F.3d at 1351, *aff'g*, 56 Fed. Cl. 377, 380 (2003); *see also Heritage of America, LLC v. United States*, 2007 WL 1585008 (Fed. Cl. May 31, 2007).[6] Further, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data General Corp. v. Johnson*, 78

---

[5] *See Murakami v. United States*, 46 Fed. Cl. 731, 734 (2000); *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 408, 410-11 (1997); *see also Florida Power & Light Co. v. Lorion*, 470 U.S. at 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents to the reviewing court."); *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (focal point of arbitrary and capricious review "should be the administrative record already in existence, not some new record made initially in the reviewing court"). As this court has explained elsewhere, *Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989) – often cited as basis for "supplementing" the administrative record – is, in part, heavily in tension with these Supreme Court precedents. *See Murakami*, 46 Fed. Cl. at 734-36.

[6] In *Banknote*, the Federal Circuit expounded upon these principles, as follows:

> Under the APA standard as applied in ... [bid protest] cases, "a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." [*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)]. When a challenge is brought on the first ground, the test is "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." *Id*. at 1332-33 (citations omitted). "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id*. at 1333.

*Banknote Corp*., 365 F.3d at 1351; *see also Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 566 (2000); *Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. 34, 42 (1997).

F.3d 1556, 1562 (Fed. Cir. 1996). Generally (with an important caveat discussed below), to demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). Finally, because injunctive relief is relatively drastic in nature, a plaintiff must demonstrate that its right to such relief is clear. *See Banknote Corp. of America*, 56 Fed. Cl. 377, 380-81 (2003), *aff'd*, 365 F.3d 345 (Fed. Cir. 2004); *Seattle Sec. Servs., Inc.*, 45 Fed. Cl. at 566; *cf. Beta Analytics Int'l., Inc. v. United States*, 44 Fed. Cl. 131, 137 n.10 (1999).

In the case *sub judice*, plaintiff's banner claim is that BAE obtained, via its prior work for the Army, unequal access to information critical to responding to the SMOTE task order in the RFP, thereby giving rise to an organizational conflict of interest. This claim begs a preliminary inquiry – what is an "organizational conflict of interest," at least for purposes of the Federal Acquisition Regulation (FAR)?

Under the FAR, an organizational conflict of interest arises when "because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage." FAR § 2.101. While noting that "[c]onflicts may arise in situations not expressly covered in this section," FAR § 9.505 indicates that there are "two underlying principles" – essentially goals – that should guide contracting officers. The first of these goals is to "prevent[] the existence of conflicting roles that might bias a contractor's judgment." *Id*. at § 9.505(a). The second is to "prevent[] unfair competitive advantage," which the regulation defines as existing where a contractor competing for an award possesses: (i) "[p]roprietary information that was obtained from a Government official without proper authorization;" or (ii) "[s]ource selection information . . . that is relevant to the contract, but is not available to all competitors" that "would assist that contractor in obtaining the contract." *Id*. at § 9.505(b). With respect to development work, FAR § 9.505-2(a)(3) states that "[i]n development work, it is normal to select firms that have done the most advanced work in the field." Noting that "[i]n many instances, the Government may have financed the development," this provision further instructs that "while the development contractor has a competitive advantage, it is an unavoidable one that is not considered unfair." *Id*.

Based on these provisions, this court has identified three basic situations in which such a conflict may arise, *to wit*, "biased ground rules," "unequal access to information," and "impaired objectivity." *Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757, 770 (2006) (quoting Daniel I. Gordon, "Organizational Conflicts of Interest: A Growing Integrity Challenge," 35 Pub. Cont. L.J. 25, 32 (2005)); *see also Vantage Assocs., Inc. v. United States*, 59 Fed. Cl. 1, 10 (2003); *Aetna Gov't Health Plans, Inc.*, 95-2 C.P.D. ¶ 129 at 12-13 (1995).[7] It is the second of these

[7] Although not binding on this court, GAO decisions are often referenced by the court as persuasive authority. *Tel-Instrument Elec. Corp. v. United States*, 56 Fed. Cl. 174, 177 n.2 (2003), *aff'd*, 87 Fed. Appx. 752 (Fed. Cir. 2004).

scenarios – unequal access to information – that is potentially present here. The responsibility for determining whether such unequal access exists and what steps should be taken in response thereto rests squarely with the contracting officer. *See* FAR §§ 9.505, 9.506; *see also The Leads Corp.*, 2003 C.P.D. ¶ 197 at 5 (2003); *RMG Sys, Ltd.*, 98-2 C.P.D. ¶ 153 at 4 (1998). In this regard, FAR § 9.505 indicates that "[e]ach individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract," adding that the contracting officer should "exercise . . . common sense, good judgment, and sound discretion" in both identifying conflicts and remedying them. This court will not overturn a contracting officer's determination in this area unless it is arbitrary, capricious or otherwise contrary to law. *See Vantage Assocs.*, 59 Fed. Cl. at 16; *see also John C. Grimberg Co, Inc. v. United States*, 185 F.3d 1297, 1300 (Fed. Cir. 1999). To demonstrate that such a determination is arbitrary and capricious, a protester must identify "hard facts," *see CACI, Inc.-Fed.*, 719 F.2d at 1582; *Filtration Dev. Co., LLC v. United States*, 60 Fed. Cl. 371, 380 (2004); "mere inference or suspicion of an actual or apparent conflict is not enough." *Mechanical Equipment Co.*, 2004 C.P.D. ¶ 192 at 25 (2003); *see also Leader Commc'ns, Inc.*, 2006 C.P.D. ¶ 192 at 4 (2006); *Snell Enters., Inc.*, 2002 C.P.D. ¶ 115 at 4 (2002); *Chemonics, Int'l*, 86-2 C.P.D. ¶ 161 at 7 (1986).

In evaluating whether a contracting officer's determination regarding unequal information is arbitrary and capricious, courts have examined: (i) whether an offeror had access to nonpublic information that was unavailable to the protester, *see, e.g.,* FAR § 9.505-4; *The LEADS Corp.*, 2003 C.P.D. ¶197 at 5 (2003); (ii) whether that nonpublic information was competitively useful in responding to the solicitation, *see*, *e.g.*, FAR § 9.505(b); *Mech. Equipment Co.*, 2004 C.P.D. ¶ 192 at 21-22; *Abt Assocs., Inc.*, 93-2 C.P.D. ¶ 269 at 6 (1993); (iii) whether, by having unequal access to that information, the awardee was afforded an advantage that was unfair, *see*, *e.g.*, FAR § 9.505(b); *Systems Plus, Inc.*, 69 Fed. Cl. at 771-72; *Operational Resource Consultants, Inc.*, 2007 C.P.D. ¶ 38 at 5-6 (2007); and (iv) whether not having equal access to that information prejudiced the protestor, *see*, *e.g.*, *TDF Corp.*, 2001 C.P.D. ¶ 178 at 9-10 (2001); *IT Facility Servs. – Jt. Venture*, 2000 C.P.D. ¶ 177 at 14 (2000). *See also* Ralph Nash, Jr., "Organizational Conflicts of Interest: An Increasing Problem," 20 Nash & Cibinic Reports 24 (2006). While the last of these factors is reminiscent of the prejudice requirement generally applicable in bid protest cases, *see Impresa Construzioni Geom.*, 238 F.3d at 1333, in the conflicts context, the prejudice inquiry is more narrow and focuses on whether the record affirmatively demonstrates that the protestor's proposal had other deficiencies that rendered the claimed lack of information inconsequential. *See Dept. of the Navy – Reconsideration*, 2002 C.P.D. ¶ 76 at 12 n.15 (2002). Importantly, the protestor need not show that the information possessed by its competitor specifically benefitted the latter's proposal – that prejudice is presumed primarily because the contracting officer must avoid and address not only actual, but apparent, conflicts of interest.[8]

---

[8] *See Filtration Dev. Co., LLC*, 60 Fed. Cl. at 379; *Lucent Techs. World Servs., Inc.*, 2005 C.P.D. ¶ 55 at 10 (2005) ("precise impact" need not be shown); *Aetna Gov't Health Plans, Inc.*, 95-2 C.P.D. ¶ 129 at 18 (1995) ("The facts that are required, however, are those which establish the existence of the organizational conflict of interest, not the specific impact of that conflict."); *see also NFK Eng'g, Inc. v. United States*, 805 F.2d 372, 376 (Fed. Cir. 1986); Ralph

The third of the above criteria – whether the awardee was afforded an advantage that was unfair – has proven nettlesome to apply, particularly in cases where the awardee has performed on related contracts. In such circumstances, courts often must distinguish between the desirable, general benefits of incumbency, and the sorts of undesirable informational imbalances that can lead to organizational conflicts of interest. Striking a line between these two, the GAO has opined –

> The mere existence of a prior or current contractual relationship between a contracting agency and a firm does not create an unfair competitive advantage, and an agency is not required to compensate for every competitive advantage gleaned by a potential offeror's prior performance of a particular requirement . . . .
>
> There is no basis to object to an offeror's advantage unless it is created by an improper preference or other unfair action by the procuring agency.

*Snell Enters., Inc.*, 2002 C.P.D. ¶ 115 at 8 (2002). Decisions of this court, as well as other GAO opinions, are to similar effect, emphasizing that the government need not forego the benefits of incumbency in ensuring a level playing field. *See Systems Plus*, 69 Fed. Cl. at 771; *Sierra Military Health Servs., Inc. v. United States*, 58 Fed. Cl. 573, 583 (2003); *WinSTAR Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998); *Lakota Tech. Solutions,* Inc., 2006 C.P.D. ¶ 118 at 4 (2006); *Versar, Inc*., 94-1 CPD ¶ 230 at 12 (1994)) ("[A]n offeror's competitive advantage gained through incumbency is generally not an unfair advantage that must be eliminated.").[9] These cases indicate that, for an organizational conflict of interest to exist based upon unequal information, there must be something more than mere incumbency, that is, indication that: (i) the awardee was so embedded in the agency as to provide it with insight into the agency's operations beyond that which would be expected of a typical government

---

C. Nash, Jr. & John Cibinic, Jr., "Protests: The 'No Prejudice' Rule," 11 Nash & Cibinic Report 20 (1997).

[9] This result makes sense for "while an agency may not unduly tip the scales in favor of an incumbent, it certainly may weigh the competitive advantages offered by that incumbent via its relevant experience and performance with the contract subject matter." *Gulf Group, Inc. v. United States*, 56 Fed. Cl. 391, 398 & n.13 (2003); *see also Phil. Produce Market Wholesalers, LLC*, 2007 WL 1266057 at *2 (Comp. Gen. May 1, 2007) ("incumbent contractors with good performance records can offer real advantages to the government in terms of lessened performance risk; accordingly, proposal strengths flowing from a firm's prior experience are proper considerations in selecting an awardee . . . ."). The FAR explicitly indicates this in the case of development contracts, holding that "while the development contractor has a competitive advantage, it is an unavoidable one that is not considered unfair." FAR § 9.505-2(a)(3); *see also Vantage Assocs*., 59 Fed. Cl. at 11-12.

contractor;[10] (ii) the awardee had obtained materials related to the specifications or statement of work for the instant procurement;[11] or (iii) some other "preferred treatment or . . . agency action" has occurred.[12]

With this framework, we return to the case *sub judice*. Here, the contracting officer set aside the initial award to BAE based upon the allegations that ARINC made in its initial GAO protest. The contracting officer then conducted an investigation into ARINC's allegation that BAE had unequal access to data related to the FOC-TOC. On November 9, 2006, she issued a determination and finding rejecting this assertion,[13] determining, in critical regard, that –

> BAE did not have access to data in performing the SETAC Task Order 0105 which would have given them an unfair competitive advantage over ARINC on the SMOTE Task Order. The SETAC FOC-TOC Task Order in field support, exercise support, and operational support. The technical data BAE had as a result of performing this work would not provide an advantage over ARINC. In fact, ARINC had access to virtually the same data in performing the JBECC Task Order, as the JBECC is an evolved version of the FOC-TOC. In fact, while ARINC was building the JBECCs, a FOC-TOC was used as a surrogate JBECC to support numerous operational deployments and exercises. The SMOTE Task order required an in-depth understanding of the FOC-TOC mission and

---

[10] *See Systems Plus*, 69 Fed. Cl. at 771; *Johnson Controls World Servs. Inc.*, 2001 C.P.D. ¶ 20 at 4 (2001); *see also Mechanical Equipment Co.*, 2004 C.P.D. ¶ 192 at 28; Keith R. Szeliga, "Conflict and Intrigue in Government Contracts: A Guide to Identifying and Mitigating Organizational Conflicts of Interest," 35 Pub. Cont. L.J. 639, 649-50 (2006).

[11] *See Lucent Techs.*, 2005 C.P.D. ¶ 55 at 10 (2005); *The Jones/Hill Joint Venture*, 2001 C.P.D. ¶ 194 at 10 (2001), *mod. on other grounds*, *Dept. of the Navy – Reconsideration*, 2002 C.P.D. ¶ 76 (2002); *GIC Agric. Group*, 92-2 C.P.D. ¶ 263 at 6 (1992); *Fortune Serv. Co.*, 90-1 C.P.D. ¶ 281 at 2 (1990); *see also Filtration Dev. Co.*, 60 Fed. Cl. at 379.

[12] *USA Information Sys., Inc.*, 96-2 B.C.A. ¶ 28,315 (1996); *see also Network Solutions, Inc.,*, 92-3 B.C.A. ¶ 25,083 (1992), *vacated, as moot, sub nom.*, *Elec. Data Sys. Corp. v. Rice*, 988 F.2d 128 (Fed. Cir. 1992); *GTE Telecom, Inc.*, 91-2 BCA ¶ 23,691 (1991).

[13] While plaintiff claims this was the first time that the contracting officer considered potential conflicts, the contracting officer indicated in her findings that, prior to the issuance of the RFP, she had considered and inquired about such conflicts, prompted by the fact that both BAE and ARINC had performed under the STARS contract. While that preliminary review is undocumented, it should be noted that the FAR does not require a contracting officer to document a conflicts analysis unless "a substantive issue concerning potential organizational conflict of interest exists." FAR § 9.504(d); *see also id* at §9.506(b); *Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 227 (2004).

> capabilities and to demonstrate an understanding of the end user requirements and methods to deliver the desired capabilities to the warfighter – an understanding and analysis of the warfighter's requirements that the mission capabilities the FOC-TOC and SSET are intended to fulfill, not in-depth knowledge of the technical data related to the FOC-TOC itself. Both BAE and ARINC had experience with the FOC-TOC merely as incumbent contractors. BAE did not have unequal access to data not available to ARINC which would have given BAE an unfair competitive advantage on SMOTE.

The contracting officer further distinguished between the SETAC tasks that BAE had performed and those required by the SMOTE task order, noting that the purposes of these tasks were "completely different." In this regard, she explained that while the task orders performed by BAE under the SETAC "were for internal integration tasks for a stand alone system, the FOC-TOC, and for development of a software application (AWARE)," the SMOTE task order was "for integration of two separate systems, the FOC-TOC and SSET, which requires proficiency relative to function, purpose, and tactical employment of a missile defense system and a space system." She found that neither BAE nor ARINC had experience with the integration of these two systems. Based on this analysis, as well as her additional findings, the contracting officer concluded that "[b]oth during the solicitation and competition phase, and upon reanalysis after considering information submitted by ARINC pursuant to its protest, I find that BAE did not have unequal access to information giving them an unfair competitive advantage causing an [organizational conflict of interest]."

While ARINC vigorously challenges this conclusion, its attack is short on specifics and long on innuendo – the antithesis of what the decisional law requires. In terms of the nature of the information that was available to the awardee and the protestor, ARINC claims that BAE possessed non-public FOC-TOC technical data and FOC-TOC/SSET integration information. But, it has pointed to nothing in the administrative record to illustrate this, let alone any hard evidence that BAE possessed information that ARINC did not. Indeed, despite the fact that, per court order, the record here contains the task orders issued under prior contracts, ARINC has not identified anything in them to suggest that, in performing these requirements, BAE developed information directly related to the integration requirements of the SMOTE task order. Nor has ARINC shown how its experience with the FOC-TOC under the STARS contract was not at least the equivalent of the experience that BAE had under its prior contract.[14] More to the point, it has

[14] Indeed, at oral argument, defendant-intervenor introduced a demonstrative exhibit that compared the SMOTE task order with the task order ARINC had performed under the STARS contract. Notably, the latter task order refers to the Tactical Space (TACSPACE) initiative on which ARINC was involved as including "[t]he Future Operations Cell-Tactical Operations Center (FOC-TOC) integration with the SSET." Indeed, it appears that the ARINC Task order, which was executed in August 2005, covered various integration tasks that are very similar to those listed in the SMOTE task order. If nothing else, the existence of this ARINC Task order belies any notion that ARINC did not know about the integration task until preliminary discussions began with respect to the COSMIC RFP.

provided nothing to contradict the contracting officer's conclusion that it had experience with both of the systems that were to be integrated under the SMOTE task order. Indeed, there is no basis to contest the contracting officer's conclusion that the information possessed by ARINC and BAE did not directly relate to the integration task that formed the heart of the SMOTE task order. Plaintiff thus has provided the court with nothing from which to conclude that the contracting officer acted in an arbitrary and capricious fashion in finding that, based upon its prior experience, ARINC had as much information as BAE regarding the various systems that were related to the SMOTE task order, and that the information that BAE had was not particularly competitively useful in responding to the task order.

Moving to the third of the conflict factors identified above, there is no indication that whatever informational differences that may have existed between BAE and ARINC gave rise to a competitive disadvantage that was unfair. As noted above, the administrative record does not support ARINC's claim that, immediately prior to the RFP, BAE was asked to perform the integration task that was later incorporated in the SMOTE task order. In this regard, ARINC relies on a set of notes – essentially a chronology of events – created by a BAE employee during meetings between the government and contractors on the SETAC contract. While these notes refer to discussions regarding the FOC-TOC/SSET integration and the assignment of government employees to certain preliminary tasks, they do not support plaintiff's claim that BAE was participating in serious efforts to accomplish the key tasks in the SMOTE task order. Indeed, while the notes indicate that, as of February 7, 2006, there was a "[n]eed to develop [a] plan of integration," they indicate that, as of March 7, 2006, the integration will be handled "GOVERNMENT TO GOVERNMENT."[15] Other statements in the record confirm that while the Army considered integrating various projects and discussed with its contractors various integration scenarios, the conversations that occurred were of a general nature and no funding was every allocated to such a project. Nor is there any indication that BAE somehow was "embedded" within the Army so as to have insights into the agency's operations beyond those that could be expected of a typical government contractor,[16] or that it somehow obtained

---

[15] On April 23, 2007, the court ordered defendant and defendant-intervenor to conduct a further review of their records for any documents reflecting discussions between BAE and any Department of Defense component regarding the integration effort. Plaintiff makes much of a handful of e-mails produced by defendant on May 11, 2007, some of which refer to integration discussions. On the whole, however, these materials are consistent with defendant's claim that only preliminary discussions of a general nature occurred, and do nothing to support plaintiff's broader claims. Indeed, the absence of more extensive documentation of any integration efforts is indicative of the fact that substantial efforts were not undertaken. Accordingly, the court does not agree that plaintiff was materially misled by the Army when the contracting officer told offerors at the industry day conference that the COSMIC Solicitation represented new work and there were no incumbent contractors doing this work.

[16] This case clearly is distinguishable from *Johnson Controls World Services*, 2001 C.P.D. ¶ 20. As described by this court in *Systems Plus*, 69 Fed. Cl. at 771:

materials related to the specifications or statement of work for the instant procurement. Thus, while plaintiff pays lip service to the bedrock premise that mere incumbency does not give rise to an organizational conflict of interest, in the end, it offers little more than BAE's incumbency in asserting – contrary to what the contracting officer found – that BAE enjoyed an unfair competitive advantage.

Turning to the last factor identified above, the court must consider, in a limited way, prejudice. In this regard, any notion that ARINC's proposal was rated poorly because of its supposed informational disadvantage is belied by several facts. First, the deficiencies that led to its SMOTE TOP being rated Marginal/High Risk had nothing to do with the claimed informational deficiencies. Rather, it appears that ARINC's low ratings were attributable to a fundamental misunderstanding of the requirements of the RFP – ARINC largely did not propose to integrate the systems covered by the SMOTE task order, but merely offered to repackage them. It was also rated poorly because it failed to propose enough qualified personnel and an appropriate labor mix – with no indication that these problems had anything whatsoever to do with a lack of information. Second, it is highly revealing that the SMOTE TOP supplied by a third offeror, Quantum, was rated higher than that of ARINC – Satisfactory/Moderate Risk – even though that small business apparently neither had any prior experience with the specific systems involved in the SMOTE task order nor, correspondingly, any information that ARINC and BAE possessed. ARINC has utterly failed to explain how, if its rating was due to a lack of nonpublic information, it was outranked by a firm that also lacked that same information.

In sum, surveying the record, the court concludes that plaintiff's arguments are based entirely on inference and suspicion and do not approach what is necessary to show that the contracting officer's determinations here were arbitrary and capricious. While difficulties sometimes may be encountered in distinguishing between the benefits of incumbency and unequal access of the sort that gives rise to an organizational conflict of interest, such is not the

---

> In *Johnson Controls*, the Comptroller General determined that a contract awardee suffered from an OCI because the awardee was "embedded" within the agency prior to the solicitation such that the awardee was "in the unique position of both having access to information to which no other offeror had access, and being involved in the management of the [facility's] support activities and the [agency's] installation support activities generally." 2001 WL 122352, at *5. The RFP distributed to prospective bidders in that case provided the number of weapons at the relevant military installation, as well as the total number of repairs to weapons that were conducted at that installation during the year. *Id*., at *4. By contrast, the incumbent supplier had access to a database that provided much more detailed information, including the exact number of each weapon that was on the base as well as the exact part that was used to repair each weapon. *Id*., at *4-5.

There is no indication that BAE had similar information here, so as to have access to the kind of specific non-public information that would create an organizational conflict of interest. *See Systems Plus*, 69 Fed. Cl. at 772.

case here – as Locke once said, "[t]hough no man can draw a stroke between the confines of night and day, still light and darkness are on the whole tolerably distinguishable."

ARINC makes several other assertions that the court likewise finds unpersuasive. For example, it contends that the Army erred in assigning its management proposal a "Marginal" rating and a "High Risk." The record, however, does not support any claim that the SSEB acted in an arbitrary and capricious fashion in identifying significant weaknesses in the proposal (none of which had anything to do with plaintiff's alleged informational deficiencies). In claiming otherwise, plaintiff "offers little more than mere disagreements with the [SSEB's] assessment of the risks associated with its proposal." *Int'l Outsourcing Servs.*, 69 Fed. Cl. at 49; *Manson Const. Co. v. United States*, 64 Fed. Cl. 746, 753 (2005). "Such naked claims," this court often has stated, "by all appearances unsupported by anything in the record, fall far short of meeting the heavy burden of demonstrating that these findings were the product of an irrational process and hence arbitrary and capricious." *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 660 (2002), *aff'd*, 56 Fed. Appx. 474 (Fed. Cir. 2003); *see also Int'l Outsourcing Servs.*, 69 Fed. Cl. at 49-50; *E.P. Prods., Inc. v. United States*, 63 Fed. Cl. 220, 226 (2005), *aff'd,* 163 Fed. Appx. 892 (Fed. Cir. 2006). That the SSEB's "Marginal" rating was not erroneous is significant in its own right, as the RFP here indicated that any offeror receiving a rating below "Satisfactory" on any of the evaluation factors (other than cost) would be ineligible for an award.

## III. CONCLUSION

This court need go no farther. Measured by the appropriate standard of review, the Army's determination that no organizational conflict of interest existed here is not arbitrary, capricious or otherwise contrary to law. The injunctive relief requested by plaintiff, therefore, is not appropriately granted.

In consideration of the above:

1. Plaintiff's motion for judgment on the administrative record is **DENIED** and defendant's cross motion for judgment on the administrative record is **GRANTED**. The Clerk is ordered to dismiss the complaint.

2. This opinion shall be published as issued after June 27, 2007, unless the parties identify protected and/or privileged materials subject to redaction prior to said date. Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons for that redaction.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge